1                    UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF MASSACHUSETTS

3

4    UNITED STATES,                     )
                                        )
5                     PLAINTIFF         )   Criminal Action
                                        )
6          -VS-                         )   No. 10-10294-NG
                                        )
7    FOREST PHARMACEUTICALS, INC.,      )   November 19, 2010
                                        )
8                                       )   11:18 a.m.
                      DEFENDANTS        )
9

10

11                    ARRAIGNMENT ON INFORMATION

12

13            BEFORE THE HONORABLE NANCY GERTNER

14               UNITED STATES DISTRICT COURT

15             JOHN J. MOAKLEY U.S. COURTHOUSE

16                    1 COURTHOUSE WAY

17                   BOSTON, MA  02210

18

19

20

21

22                    VALERIE A. O'HARA
23                  OFFICIAL COURT REPORTER
                  UNITED STATES DISTRICT COURT
24           1 COURTHOUSE WAY, COURTROOM 3204
                    BOSTON, MA  02210
25              E-mail:  vaohara@gmail.com

1    A P P E A R A N C E S:

2    FOR THE PLAINTIFF:

3

4         United States Attorney's Office, by JAMES E. ARNOLD,
     ASSISTANT UNITED STATES ATTORNEY, Suite 9200, Boston,

5    Massachusetts  02210, for the United States;

6         United States Department of Justice, by JEFFREY I.
     STEGER, ESQ., 450 Fifth Street, N.W., P.O. Box 386,

7    Washington D.C.,  20044, for the United States;

8    FOR THE DEFENDANT:

9         Debevoise & Plimpton, by ANDREW J. CERESNEY, ESQ. and
     BRYAN P. KESSLER, ESQ., 919 Third Avenue, New York, New York

10   10022-3902, for the Defendant;

11        Sugarman, Rogers, Barshak & Cohen, P.C., by WILLIAM F.
     BENSON, ESQ., 101 Merrimac Street, Boston, Massachusetts

12   02114-4737.

13   ALSO PRESENT:  Herschel Weinstein, General Counsel for
     Forest Pharmaceuticals

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

2          THE COURT:  Counsel, will you identify yourselves,

3   please.

4          MR. ARNOLD:  Good morning, your Honor, this is

5   Assistant U.S. Attorney Jim Arnold for the United States.

6   With me is Jeff Steger from the United States Department of

7   Justice's Office of Consumer Litigation.

8          MR. STEGER:  Good morning, your Honor.

9          MR. CERESNEY:  Good morning, your Honor,

10   Andrew Ceresney and Bryan Kessler from Debevoise & Plimpton

11   in New York.  With me today is also Bill Benson from

12   Sugarman, Rogers, and seated with us today on behalf of

13   Forest is Herschel Weinstein, the general counsel.

14          THE COURT:  Is he the one who will be submitting

15   the plea?

16          MR. CERESNEY:  He will, your Honor.

17          THE COURT:  All right.  Then I suppose

18   Mr. Weinstein should stand first.  Before you take the plea,

19   Mr. Weinstein, tell me again and put on the record what your

20   position is and how you bind the company.

21          MR. WEINSTEIN:  I am vice-president, general

22   counsel of Forest Pharmaceuticals and its parent, Forest

23   Laboratories.

24          THE COURT:  So you have the authority to bind the

25   company to this plea agreement and this plea?

1          MR. WEINSTEIN:  Yes, I do.

2          MR. CERESNEY:  Just for the record, your Honor,

3    Exhibit F to the plea agreement has a resolution of the

4    Board of Directors of Forest Pharmaceuticals which provides

5    Mr. Weinstein with that authority as well.

6          THE COURT:  Exhibit F is dated September 14th,

7    2010.  Do I have the right one?

8          MR. CERESNEY:  Yes.  Yes, that's correct.

9          THE COURT:  The government is content that that in

10   fact gives Mr. Weinstein the authority to do what he's doing

11   today?

12         MR. ARNOLD:  We are.

13         (Forest Laboratories, Inc. through

14   Herschel Weinstein was sworn.)

15         THE CLERK:  Mr. Weinstein, as to Count 1,

16   obstruction of agency proceedings, Title 18, U.S.C.,

17   Section 1505; Count 2, distribution of an unapproved new

18   drug, all in violation of Title 21, Section 331, 333(a)(1)

19   and 355(a); as to Count 3, distribution of a misbranded

20   drug, inadequate directions for use, all in violation of

21   Title 21, U.S.C., Section, 331, 333(a)(1) and 3352(f)(1),

22   how do you plead to Counts 1, 2 and 3, guilty or not guilty?

23         MR. WEINSTEIN:  Guilty.

24         THE CLERK:  Okay.

25         THE COURT:  Why don't you take the stand,

1    Mr. Weinstein.  Do you want to stand with him, you certainly

2    can.  Why don't you sit down.  Before I begin, I note this

3    is an 11(c)(1)(c) plea; is that right?

4           MR. ARNOLD:  That is correct, your Honor.

5           THE COURT:  And further it has a waiver of appeal,

6    and while I ordinarily don't accept waivers of appeal, I

7    make an exception for 11(c)(1)(c), and I would particularly

8    make an exception in a situation where a corporation well

9    represented has entered into a waiver, so that won't be a

10   problem.  Okay.  So, Mr. Weinstein, you are the subject of

11   the resolution of the Board of Directors dated

12   September 14th, 2010?

13          MR. WEINSTEIN:  Yes, I am.

14          THE COURT:  And you're satisfied with your

15   lawyer's representation of the corporation?

16          MR. WEINSTEIN:  Yes, I am.

17          THE COURT:  I'm modifying the usual to tailor it

18   to this event.

19          MR. WEINSTEIN:  I am.

20          THE COURT:  How long has this been in negotiation?

21          MR. WEINSTEIN:  Oh, I would say negotiations

22   probably started two years ago, 18 months to two years

23   ago.

24          THE COURT:  Okay.  And you are fully competent, I

25   take it, personally competent to make judgments today, that

1    is to say, you're not under the influence of any drugs,

2    you're not under the influence of any alcohol?

3              MR. WEINSTEIN:  I'm good today, I'm fine.  Yes,

4    thank you.

5              THE COURT:  Counsel, will you give me a

6    description of what the charges are and what the facts are?

7              MR. ARNOLD:  Surely, your Honor.  With respect to

8    the charge is Count 1 charges Forest Pharmaceuticals with

9    obstruction of an agency proceeding in violation of

10   Title 18, United States Code, Section 1505, and the elements

11   of that offense are that there was an agency proceeding,

12   that the defendant was aware of that proceeding and that the

13   defendant intentionally endeavored corruptly to influence,

14   obstruct or impede the pending proceeding, and I'm also

15   going to give you Count 2 because I'm going to be discussing

16   certain facts pertaining to both Counts 1 and 2 together.

17             THE COURT:  Okay.

18             MR. ARNOLD:  Count 2 charges Forest with

19   introducing for delivery and into interstate commerce a drug

20   called Levothroid, which was an unapproved new drug in

21   violation of Title 21, United States Code, Sections 331(d),

22   333(a)(1) and 355.

23             This charge has the following elements:  The

24   defendant introduced into interstate commerce or caused the

25   introduction or delivery for introduction into interstate

1    commerce the drug Levothroid; that Levothroid was a new drug

2    under the Food, Drug & Cosmetic Act and that it was a drug

3    that was not generally recognized among qualified experts as

4    safe and effective for use under the conditions prescribed,

5    recommended or suggested in the drugs labeling; and, 3, that

6    the United States Food & Drug Administration had not

7    approved the manufacture and distribution of Levothroid

8    pursuant to a new drug application or an investigational new

9    drug application.

10          With respect to the facts pertaining to those two

11   counts, had the case gone to trial, the United States would

12   have proven through a combination of witness testimony and

13   documents that Forest was a wholly-owned subsidiary of

14   Forest Laboratories, Inc. and had its principal place of

15   business in St. Louis, Missouri; Forest manufactured,

16   promoted and distributed in interstate commerce prescription

17   drugs intended for human use throughout the United States

18   including the District of Massachusetts; Forest had a

19   manufacturing and packaging facility in Cincinnati and a

20   distribution center in St. Louis.

21          Counts 1 and 2 that I just described both concern

22   a drug called Levothroid.  Levothroid was an

23   orally-administered levothyroxine sodium drug product that

24   Forest marketed for the treatment of patients suffering from

25   hypothyroidism, which is a medical condition in which an

1    individual has a thyroid or hormone deficiency.

2            As background to these counts, the government

3    would have established that in or about 1991, Forest's

4    parent company, Forest Labs, bought the rights to

5    Levothroid.  Forest later moved the manufacturing and

6    packaging of Levothroid to its Cincinnati plant and after

7    manufacturing and packaging, Forest transferred Levothroid

8    to its St. Louis distribution facility.

9            The United States would have established that at

10   no time through and including August 9th, 2003 did Forest

11   receive FDA approval of a new drug application, also known

12   as an NDA, to market and distribute Levothroid using the

13   formulation and manufacturing processes then being used at

14   its Cincinnati plant.

15           The United States would have further established

16   that the Levothroid product being manufactured and

17   distributed by Forest between August 14th, 2001 and

18   continuing through on or about August 9, 2003 was a new drug

19   under the Food, Drug and Cosmetic Act, the FDCA.

20           Specifically the United States would have

21   established that given the specific formulation and

22   manufacturing processes used by Forest during this time

23   period, there was not adequate data establishing that

24   Levothroid had consistent potency and stability to be

25   generally recognized by qualified experts as safe and

1    effective for use under its labeled conditions.

2         The government would have established that FDA is

3    the federal agency responsible for protecting the health and

4    safety of the public by enforcing the Food, Drug and

5    Cosmetic Act, ensuring the drugs intended for humans were

6    safe and effective for their intended uses and that the

7    labeling of those drugs bore accurate information.

8         The government would have introduced evidence

9    establishing that on August 14th, 1997, the FDA issued a

10   notice in the federal register announcing its conclusion

11   that all levothyroxine sodium drugs on the market, including

12   Levothroid, were new drugs within the meaning of the FDCA

13   because none of them had been shown to demonstrate

14   consistent potency and stability necessary to be generally

15   recognized as safe and effective.

16        The FDA announced in the federal register that

17   manufacturers of these drugs needed to file an NDA and

18   obtain FDA approval to permit continued marketing of the

19   products.  The FDA stated that as a matter of enforcement

20   discretion, it would permit manufacturers to continue

21   distribution of their unapproved drugs until August 14th,

22   2000.  The FDA later extended this grace period to

23   August 14th, 2001.

24        The United States would have introduced evidence

25   establishing that on July 13th, 2001, the FDA issued a

1    guidance for industry concerning levothyroxine sodium drugs.

2         The FDA announced that in the exercise of its

3    enforcement discretion, it was establishing a gradual

4    phase-down plan for the unapproved drugs remaining on the

5    market.  The FDA repeated that the marketing unapproved

6    levothyroxine drugs without first obtaining an NDA approval

7    was illegal.  The FDA advised, however, that it did not

8    intend to take enforcement action if the companies that did

9    not yet have an approved NDA complied with all aspects of

10   the phase-down plan.

11        With respect to Count 1, the United States would

12   have established that in response to the 1997 notice, Forest

13   and Forest Labs prepared an NDA for Levothroid or submitted

14   the NDA to the FDA on or about September 27th, 2000.  Forest

15   knew and understood that the FDA needed stability data that

16   supported the expiration dates that the company was

17   proposing for its drug.

18        Stability testing was lab testing necessary to

19   demonstrate the shelf life of a drug, the length of time

20   during which the drug had the appropriate identity,

21   strength, quality, purity and potency.  Forest knew and

22   understood that the FDA required that the stability data be

23   obtained under specific control temperatures and relative

24   humidity conditions, namely temperature between 25 plus or

25   minus 2 degrees Celsius and relative humidity between 60

1   percent plus or minus 5 percent.  Those conditions are

2   referred to as ICH conditions.

3        The government would have proven that employees in

4   the Forest Cincinnati plant repeatedly submitted stability

5   data to Forest Labs for inclusion in the NDA in various

6   amendments to the Levothroid NDA that purported to have been

7   obtained under ICH conditions when in fact it was well-known

8   by plant management personnel and others within the

9   Cincinnati plant that serious equipment malfunctions had

10  resulted in humidity levels significantly below ICH

11  conditions for extended periods of time totaling hundreds of

12  days and thousands of hours.

13       These humidity excursions results in testing

14  results that misrepresented and overstated Levothroid's

15  potency relative to its expiration date.  The government

16  would have shown that in an attempt to remedy these

17  significant humidity excursions on or around January 21,

18  2003 certain Forest Management personnel at the Cincinnati

19  plant decided to put a portable home humidifier in the room

20  where the stability testing was being conducted as a

21  temporary fix to the humidity problem.

22       Forest knew that this temporary fix would not

23  maintain the relative humidity at ICH levels as the portable

24  humidifier which required constant monitoring and refills of

25  water did not work effectively through the night or through

1    an entire weekend.

2         Between November 17th, 2003 and December 3rd,

3    2003, the FDA conducted a regulatory inspection of Forest's

4    facility in Cincinnati pursuant to the FDA statutory

5    inspection authority.  During this inspection, the FDA

6    discovered the portable humidifier in the room Forest used

7    for its stability studies in support of the Levothroid NDA.

8         When the FDA investigators asked about this

9    portable humidifier, certain Forest management personnel at

10   the Cincinnati plant falsely stated that the portable

11   humidifier was being stored in the room and falsely denied

12   that the portable humidifier had ever been used for humidity

13   control.

14        The following day certain Forest management

15   personnel at the Cincinnati plant admitted to the FDA

16   investigators that the regular humidifier was not

17   functioning properly and that the portable humidifier had

18   been used to increase the humidity level in the room.

19        With respect to Count 2, the government would have

20   established that Forest took no affirmative steps to limit

21   its distribution of Levothroid in compliance with the FDA's

22   phased-down distribution plan in the guidance document that

23   the FDA issued in July of 2001.

24        The government would have established that Forest

25   initially hoped that it would through market forces alone

fall into compliance with the phase-down schedule and obtain NDA approval quickly, however, by April, 2002, it was clear to Forest that Levothroid NDA was not going to be approved quickly.

As a result, on or about April 18th, 2003, Forest had a meeting to determine whether to comply with the phase-down schedule.  The United States would have introduced evidence establishing that Forest decided internally not to comply with the guidance phase-down schedule.

Thereafter Forest continued distributing its unapproved Levothroid product at rates well over the levels established in the Guidance.  On August 7th, 2003, the FDA issued a warning letter to Forest Labs addressing Forest's failure to limit its distribution of its unapproved new drug Levothroid consistent with the phase-down schedule.

The warning letter advised Forest Labs that FDA had determined that Forest had deliberately decided not to follow the agency's phase-out plan.  As a result, the FDA advised Forest Labs that "You are no longer entitled to the enforcement discretion granted by the agency and are hereby on notice that the distribution of your unapproved product Levothroid remains in violation of Section 505 of the act."

The evidence would have established that Forest received the warning letter by late morning on Friday,

1    August 8th, 2003.  Rather than immediately stop Levothroid

2    distribution, Forest instead directed its employees to

3    continue shipping as much Levothroid product as possible.

4    Not until approximately 1 a.m. on August 9th, 2003 did

5    Forest stop packaging and shipping Levothroid to its

6    customers, and by that time Forest had filled the Levothroid

7    orders for all of its primary larger customers.

8           The United States would have further introduced

9    evidence establishing that Forest's gross gain from its

10   interstate distribution of its unapproved Levothroid product

11   was $70,326,246 during the applicable time period.

12          With respect to Count 3, I'm going to ask that

13   Mr. Steger provide that to the Court.

14          THE COURT:  That's fine.  Go on.

15          MR. STEGER:  Your Honor, Count 3 charges Forest

16   with introducing for delivery and for interstate commerce

17   Celexa, which was a misbranded drug in violation of 21,

18   U.S.C., Sections 331(a), 333(a)(1) and 352(f)(1).  This

19   charge has the following elements:  1, that defendant

20   introduced into interstate commerce, delivered for

21   introduction into interstate commerce or caused the

22   introduction or delivery for introduction into interstate

23   commerce the drug Celexa; 2, that Celexa was a drug under

24   the Food, Drug & Cosmetic Act; and, 3, that Celexa was

25   misbranded in that it lacked adequate directions for use for

1    the uses intended by defendant.

2         Had the case gone to trial, the United States

3    would have proven the following through a combination of

4    witness testimony and documents:  In 1998, FDA-approved

5    Celexa for the treatment of adult depression.  The FDA never

6    approved Celexa for the treatment of any condition other

7    than adult depression or for any use in children or

8    adolescents.

9         Following FDA approval, Forest began promoting,

10   distributing and selling Celexa throughout the United

11   States, including in the District of Massachusetts.  The

12   United States would have shown that Forest was aware that

13   the FDA had not approved Celexa for treatment of any

14   condition other than adult depression.

15        In or about April, 2002, Forest Labs in an attempt

16   to obtain, among other things, a pediatric indication for

17   Celexa submitted data to the FDA from two double-blinded

18   placebo controlled studies involving the use of Celexa in

19   children.  One of these studies, the Forest study, was

20   sponsored by Forest Labs.  The Forest study indicated that

21   Celexa was more effective than placebo in treating pediatric

22   patients suffering from depression.

23        The other study, the European study, had been

24   conducted in Europe and sponsored by the Danish company

25   that had developed and owned the rights to Celexa.  The

1    European study had negative results, that is, the study did

2    not show Celexa to be any more effective than placebo in

3    treating pediatric depression.

4           On or about September 23d, 2002, the FDA denied

5    Forest Labs' request for a pediatric indication for Celexa.

6    If the case had gone to trial, the United States would have

7    introduced evidence establishing that Forest was aware that

8    promoting a drug product for indications other than those

9    approved by FDA was illegal.

10          The United States would have further demonstrated

11   that beginning in 1998 and continuing thereafter through at

12   least September, 2002, Forest promoted Celexa for use in

13   treating children and adolescents suffering from depression,

14   even though Celexa was not FDA approved for pediatric use.

15          Forest's off-label promotion consisted of various

16   sales techniques including directing Forest sales

17   representatives who promoted Celexa to make sales calls to

18   physicians who treated children and adolescents promoting

19   Celexa by various Forest's sales representatives for use in

20   children and adolescents, hiring outside speakers to talk to

21   pediatricians, child psychiatrists and other medical

22   practitioners who specialized in children and adolescents

23   about the benefits of prescribing Celexa to that patient

24   population and for publicizing and circulating the positive

25   results of the double-blind placebo controlled Forest study

on the use of Celexa in adolescents while at the same time
failing to discuss the negative results of the second
double-blind placebo controlled European study on the use of
Celexa in adolescents.

With respect to the speaking engagements, for
example, the United States would have introduced evidence
establishing that four sales representatives and division
managers identified speakers from lists maintained and
approved by Forest to organize promotional lunches and
dinners as part of which speakers were paid to give a talk
about Celexa.  Certain of Forest approved speakers were
medical practitioners who specialized in treating children
and adolescents suffering from depression, and Forest paid
these practitioners to give promotional talks on the use of
Celexa in children and adolescents.

In or about mid-2001, Forest learned of the
positive results from the Forest study and the negative
results from the European study, and Forest Labs shared
these results with the FDA.  Forest treated the studies
differently.  Forest publicized and promoted the results
from the positive Forest study while at the same time Forest
did not publicize or disclose the results of the negative
study to persons outside the FDA or the Danish company which
sponsored the negative study.

Forest did this in various ways including via

1    certain discussions that Forest sales representatives had

2    with medical practitioners about the use of Celexa in

3    treating children, via certain promotional speeches made by

4    pediatric specialists who were hired by Forest to talk about

5    the use of Celexa in treating children and adolescents and

6    via letters sent by Forest Professional Affairs Department

7    to medical practitioners who had requested from Forest all

8    available information and data concerning the use of Celexa

9    in treating children and adolescents.

10          Lastly, the United States would have further

11   introduced evidence that this violation occurred beginning

12   as early as 1998 and continued through in or about December,

13   2002 and that during this time period Forest delivered for

14   introduction into interstate commerce and caused the

15   delivery for introduction in interstate commerce into

16   Massachusetts and elsewhere various quantities of Celexa for

17   unapproved use in pediatric and adolescent patients which

18   was misbranded in that Celexa's labeling lacked adequate

19   direction for such use.

20          Forest's pecuniary gain resulting from this

21   violation was $28,040,000.

22          THE COURT:  So there are two questions that I will

23   ask with respect to that presentation.  Well, first of all,

24   what are the penalties, the maximum penalties with respect

25   to each of those charges?

1          MR. ARNOLD:  The maximum penalties, your Honor,

2    with respect to Count 1 is a maximum fine of $500,000, twice

3    the gross gain derived from the offense, twice the gross

4    loss to a person other than Forest, whichever is greatest,

5    in this case, the maximum fine is in fact $500,000, a term

6    of probation of not less than one year and not more than

7    five years, restitution to any victims of the offense and a

8    mandatory special assessment in the amount of $400.

9          With respect to Count 2, the maximum fine is a

10   fine of $200,000 or twice the gross gain derived from the

11   offense or twice the gross loss to a person other than the

12   defendant, whichever is greatest, given that Forest's gross

13   gain from its sales of the unapproved new drug Levothroid

14   between August 14th, 2001 and August 9, 2003 totalled

15   $70,326,246.

16         The maximum possible fine in connection with this

17   count is $140,652,492, the term of probation of not more

18   than five years, one of the terms of which may include an

19   order of restitution and a mandatory special assessment of

20   $125.

21         With respect to Count 3, which was the unapproved,

22   the promotion of Celexa that Mr. Steger described, the

23   maximum fine is a fine of $200,000 or twice the gross gain

24   derived from the offense or twice the gross loss to a person

25   other than the defendant, whichever is greatest.  Given that

1   Forest sales of the misbranded drug Celexa totalled

2   approximately $28,040,000, the maximum possible fine in

3   connection with this count is $56,080,000, a term of

4   probation of not more than five years, one of the terms of

5   which may include an order of restitution and a mandatory

6   special assessment of $125.

7           Additionally, as is set forth in the plea

8   agreement, forfeiture is a potential punishment in this

9   case.

10          THE COURT:  Okay.  Mr. Weinstein, I'm obliged to

11  alert you on behalf of the corporation to the maximum

12  penalties, but I understand this is an 11(c)(1)(c) plea, so

13  the way this would work would be that if I accept the plea

14  terms, then that will be what the sentence for the

15  corporation will be.  If I don't accept the plea terms, then

16  you are able to withdraw your plea and proceed with trial.

17          MR. WEINSTEIN:  That's what I understand.

18          THE COURT:  Then likewise the allegations that

19  were made by both counsel, are these facts true?

20          MR. WEINSTEIN:  They're consistent with what I

21  believe the facts to be.

22          THE COURT:  Okay.  So essentially the corporation

23  is pleading guilty to these charges because it is guilty and

24  for no other reason?

25          MR. WEINSTEIN:  That's correct.

1        THE COURT:  This case is proceeded by way of a

2   waiver of indictment.  You, of course, understand that by

3   proceeding by waiver of information, by information rather

4   than indictment, you give up your rights to have a grand

5   jury hear the government's case, determine if there's

6   probable cause to proceed.  Do you understand that?

7        MR. WEINSTEIN:  I do understand that.

8        THE COURT:  Since you're a lawyer, this is a

9   little bit superfluous, but you also by pleading guilty, by

10  the corporation pleading guilty, you lose all the benefits

11  of a jury trial in which the jury would hear the

12  government's case, I have to go through this, the government

13  would have to prove to a jury the corporate guilt beyond a

14  reasonable doubt.

15       There's no obligation to mount a defense or to put

16  on witnesses or certainly to make any admissions, but you

17  could choose to put on witnesses, subpoena witnesses, make

18  whatever admissions you wish if you so chose, but you give

19  up all those rights when you plead guilty, when you, the

20  corporation pleads guilty.  I don't want you to get

21  hysterical, you're not pleading guilty, you're pleading

22  guilty on behalf of the corporation.

23       Okay.  The plea agreement is not binding on me

24  except in the way that I've just described, which it links

25  the plea to the sentence.  If I reject the sentence, then

1     you can set aside your plea.  There are a couple of

2     provisions of the plea.  There was a reference, the plea

3     agreement is coupled with an agreement to not further

4     prosecute Forest for any additional federal charges, is that

5     right, this is page 6?

6            MR. ARNOLD:  There were certain limitations, your

7     Honor.  It's not a blanket.

8            THE COURT:  Right.

9            MR. ARNOLD:  Get out of jail free card.

10           MR. ARNOLD:  No, it's not.  It defines as set

11    forth in Section 5 of the plea agreement that the government

12    has agreed not to prosecute Forest for any additional

13    federal criminal charges with respect to conduct that falls

14    within the scope of the information to which Forest is

15    pleading guilty, was subject of the grand jury investigation

16    in the District of Massachusetts relating to Levothroid as

17    manufactured prior to August 14th, 2003 relating to the

18    sale, promotion or marketing of Celexa and Lexapro in the

19    United States, or it was not known to the United States

20    Attorney's Office for the District of Massachusetts or the

21    Office of Consumer Litigation of the Department of Justice

22    prior to the date of the agreement and which concerned the

23    sale, promotion, manufacture or marketing of Levothroid as

24    manufactured prior to August 14, 2003 in the United States

25    or which concerned the sale, promotion or marketing of

1    Celexa or Lexapro in the United States through December 31,

2    2005.

3          The declination is also expressly contingent upon

4    the guilty pleas of Forest to the information attached as

5    Exhibit A being accepted by the Court and not withdrawn or

6    otherwise challenged and Forest's performance of all its

7    material obligations as set forth in this agreement and the

8    attached civil settlement agreement.

9          THE COURT:  Okay.  I didn't mean to short-circuit

10   your carefully worked out plea, but essentially the document

11   defining this plea is the document that I've been given

12   dated September 15th, 2010 with a number of exhibits

13   attached to it.  Perhaps that's the best way to proceed

14   rather than my trying to characterize anything, and this is

15   a document, this being the agreement September 15th, 2010 is

16   an agreement that the corporation has willing entered into?

17         MR. WEINSTEIN:  Forest Pharmaceuticals has, yes.

18         THE COURT:  And Forest Pharmaceuticals has not

19   been threatened in any way to enter into this agreement?

20         MR. WEINSTEIN:  Other than the prosecution

21   itself.

22         THE COURT:  Yes.

23         MR. WEINSTEIN:  Yes.

24         THE COURT:  Okay.  I mentioned the waiver of

25   appeal which I will accept.  That would be a good thing for

1   Mr. Weinstein to sign now the waiver of indictment.

2        MR. CERESNEY:  Your Honor, while we're doing this,

3   I wanted to raise one issue.  We have now executed it.  I

4   understand that your Honor had considered or had been

5   intending to order a pre-sentence report and order a

6   sentencing date in the future.  I would just ask though if

7   your Honor is inclined, there is a provision under the

8   agreement which allows us to request, and I think the

9   government doesn't oppose, both plea and sentencing today

10  based upon the (c)(1)(c) plea obviously carefully negotiated

11  after a lengthy negotiation.

12       THE COURT:  I wish I had some warning about that.

13  I don't want to do it now.  I'm in the middle of another

14  jury trial, and I really don't want to proceed from one to

15  the other.  I appreciate, that means everyone would have to

16  come back, but I don't necessarily -- does the government

17  take a position on whether you need a pre-sentence report

18  here?

19       MR. ARNOLD:  The government pursuant to the plea

20  agreement stated that we don't object to the Court

21  proceeding to sentence immediately following the Rule 11

22  plea hearing or in the absence of a pre-sentence report.  We

23  would note, however, that, for example, forfeiture documents

24  have not yet been prepared or submitted to the Court.

25       MR. CERESNEY:  We would obviously, if there were

1    an open issue like forfeiture, which I understand you can

2    actually order and then have the paper done afterwards, we

3    would obviously be amenable to that.  What we're trying to

4    avoid is obviously needing to return and also an obviously

5    carefully negotiated agreement.

6            THE COURT:  I think needing to return would be

7    unavoidable under the circumstances because I really have to

8    conclude this.  One other clarification for my purposes,

9    there is a civil settlement agreement, which is independent

10   of this, it's attached to it, but essentially a violation of

11   that settlement agreement doesn't trigger a breach of the

12   plea agreement.  Is that correct?  Did I read that

13   correctly?  You haven't reduced this to your memory?

14           MR. ARNOLD:  Well, your Honor, if you look at the

15   breach of agreement paragraphs, this is page 11, it does

16   indicate that Forest understands and agrees that this plea

17   agreement is an agreed criminal disposition are wholly

18   dependent upon Forest's timely compliance with the material

19   provisions of the attached civil settlement agreement.

20           THE COURT:  Then it says, "failure to comply," oh,

21   failure to comply will constitute a breach.

22           MR. ARNOLD:  Will constitute a breach.

23           THE COURT:  Okay.  I read that wrong.

24           MR. CERESNEY:  Except for the corporate integrity

25   agreement.

1        MR. ARNOLD:  Except for the CIA, right, the

2   corporate integrity agreement.

3        THE COURT:  Okay.  I see.  My understanding of

4   this document is less significant than your understanding of

5   this document, and I assume that you were one of the

6   principal negotiators of it?

7        MR. WEINSTEIN:  I was together with outside

8   counsel.

9        THE COURT:  Okay.  All right.  I think that is

10  really all that I need to address.

11       MR. ARNOLD:  Does the Court wish me to quickly

12  apprise it of what the terms of the (c)(1)(c) agreement are

13  with respect to the actual penalties?

14       THE COURT:  We can do that.

15       MR. ARNOLD:  The parties have agreed that the

16  appropriate resolution for this case would be a criminal

17  fine of $150 million be imposed as follows:  Count 1,

18  $500,000; Count 2, $110,000,000; Count 3, $39,500,000.  The

19  criminal fine is to be paid within one week of the date of

20  sentencing.

21       Mandatory special assessments totaling $650 to be

22  imposed as follows:  Count 1, $400; Count 2, $125; and

23  Count 3, $125.  Criminal forfeiture in the amount of

24  $14,000,000, and in light of certain pending civil actions

25  identified in the plea agreement and the civil settlement

1    agreement between Forest and the United States, which

2    required payment of $149,158,057.66 plus interest, the

3    parties have agreed that the complication and prolongation

4    of the sentencing process that would result from an attempt

5    to fashion a restitution order outweighs the need to provide

6    restitution to any nonfederal victims in this case given the

7    difficulty of determining whether and to what extent any

8    unknown individual payor suffered any injury as a result of

9    the offenses.

10          As a result, the United States agrees that it will

11   not seek a separate restitution order as to Forest as part

12   of the resolution of the information, and the parties agree

13   that the appropriate disposition of this case does not

14   include a restitution order.

15          THE COURT:  All right.  So, again, that's the

16   agreed upon disposition pursuant to 11(c)(1)(c).  If I

17   accept that, that will be the sentence; if I don't, we can

18   begin again.  I'm going to accept the plea.  I find it

19   knowing and voluntary.  You can go back to your seat.  What

20   time do you need to do the forfeiture papers?  What's an

21   appropriate time for everyone to have this sentence?

22          MR. ARNOLD:  I think we had already been given a

23   date by your clerk of March 16th.

24          THE COURT:  I don't believe that there's a

25   necessity for a pre-sentence report so that date could be

1    advanced if you wished.

2         MR. CERESNEY:  I guess from our perspective, your

3    Honor, a date, we don't think there's a need, we agree to a

4    pre-sentence report for other submissions.  We have an

5    agreement on the sentencing factors, and we would ask for a

6    date when the forfeiture papers are drawn.

7         THE COURT:  What I propose is this so that we

8    don't deal with everyone's schedules, file a motion to waive

9    the pre-sentence report and to set a scheduling date and do

10   that as a matter of an agreement.  We can fit in whenever

11   you can do it.  Okay.  Is there anything else I have to

12   address now?

13        MR. ARNOLD:  No, your Honor, though the government

14   does reserve its right to submit a sentencing memorandum in

15   support of the plea agreement.

16        MR. CERESNEY:  I understand that, but I would

17   imagine your Honor has plenty of paper on this case

18   already.

19        THE COURT:  Yes.  Essentially if the document says

20   I waive the pre-sentence report, here's the date we propose

21   for sentencing, and then if you wish to file something, you

22   may as well, put this all in the terms of the document so I

23   can just put that on my docket.

24        MR. ARNOLD:  We will, your Honor.  Thank you.

25        THE CLERK:  All rise.

```
1              (Whereupon, the hearing was suspended at

2     11:48 a.m.)

3

4              C E R T I F I C A T E

5

6     UNITED STATES DISTRICT COURT )

7     DISTRICT OF MASSACHUSETTS    )

8     CITY OF BOSTON               )

9

10             I, Valerie A. O'Hara, Registered Professional

11    Reporter, do hereby certify that the foregoing transcript

12    was recorded by me stenographically at the time and place

13    aforesaid in No. 10-10294-NG, United States vs. Forest

14    Pharmaceuticals, Inc. and thereafter by me reduced to

15    typewriting and is a true and accurate record of the

16    proceedings.

17                        /S/ VALERIE A. O'HARA

18

19                        _____

20                        VALERIE A. O'HARA

21                        REGISTERED PROFESSIONAL REPORTER

22                        DATED FEBRUARY 8, 2011

23                        _____

24

25
```